And if you can just hang on for a moment while we let the courtroom clear out a bit. I guess that's it. Good morning, may it please the Court. My name is Stephen Smith.  My name is Stuart Carlin. I represent the appellant plaintiff below, Krista O'Neill. I'd first like to delve into the issue of collateral estoppel. As the Court is aware, there's two types of collateral estoppel. One is fact-based and one is issue-based. I believe in this particular instance, the court decision by the Orange County Supreme Court, making a number of factual determinations, should apply in this instance. Can I just ask you, though, I mean, isn't that a step-two sort of concern? I mean, you have to establish a prime official case first before we get into, oh, this refutes their defense. And to me, the collateral estoppel angle that you're addressing is that. It's step two as opposed to step one, isn't it? Right, but part of the prima facie case is that, for example, that the court ruled that my client's workload doubled, that besides her normal responsibilities, she had to cover classes, she had supervisory duties. In terms of what you have to show first, I mean, don't we have to address first, okay, the prima facie case of that she's qualified, that there was adverse, I think we have to deal with that before we get to the collateral estoppel, don't we? Yes, but I don't think she was not terminated for her actual performance. Which element of the prima facie case to which Judge Lee refers as the collateral estoppel address? That the reasons that they proffered were not legitimate.  That were not legitimate. But that's the pretext stage. What Judge Lee is asking, and I am joining her in, is the elements of the prima facie case, to which of those elements does the collateral estoppel you wish us to find go? Okay. So she's an African-American. She was otherwise qualified to perform the functions of her position. She was terminated and she was replaced by a Caucasian employee. And that the reasons offered for her termination were not legitimate. The court below stated that her workload doubled. They gave a variety of examples of why it doubled. And it was, quote, unquote, impossible, impossible for her to do what Brancato, who was the attendance teacher, asked her to do. Period. That the circumstances regarding her termination were not similar to the circumstances regarding the last chance agreement. I think we were, I can't speak for my colleagues, but I was, on the prima facie cases, where are the allegations or the inference, the evidence of inference of discrimination? I know you want to take us to the pretext that, you know, because of the proceedings below.  A couple of things. Well, there's more than a couple of things. Number one, she was asked to cover classes. No other speech therapist was asked to cover classes. Extremely time-consuming process because she has to, she covered 100 to 150 classes during the pandemic year. No other speech therapist was required to cover classes. But I thought other staff members were required to cover classes at that school, which was severely understaffed. And wasn't she the only speech therapist at that school? She was the only speech therapist at that school. But, you know, no one, but the bottom line is they're not comparative. If you look at, I have to compare what was going on outside the parameters and look to other speech therapists. And no other speech therapist was asked to cover classes. The pandemic, I think the court can take judicial notice that the pandemic was obvious, impacted everything, everywhere. But isn't it, I mean, just to go back for a second to the question of comparators, if there aren't other speech therapists at that school, at the schools that she worked at, to say, to compare her to speech therapists at other schools when part of what's going on here are part of the policies here are school-specific. And so to say, well, a speech therapist at another school wasn't required to input information in two different platforms, even though this was the only school that had the two. I mean, I think that you still have to come, there still has to be some kind of comparison made, doesn't there? Okay. Well, if I could just circle around again. Besides, I understand what Your Honor is saying, but the bottom line is, is that she was the only one who had to do it in addition to her other duties. The service providers that came in, the physical and occupational therapists, didn't have to do it, even though they're not exactly in the same job title. What's the connection, I guess, to these additional workload burdens? What is the connection to racial discrimination?  So Brancato was advised by Orwick, the special ed director of Newberg, the only platform that counts is the original platform, the IEP direct. For attendance purposes, that's the only thing that counts. That's the only thing I care about. In the meetings, she was asked repeatedly, in the meetings, well, which one is more important? And she was never given an answer. In fact, she was told that the other platform, what Brancato told her, was more important. If she had been told that for attendance purposes, for attendance purposes, the IEP direct was the only thing that really mattered, then it would not, then she wouldn't have been terminated because she would have at least satisfied the attendance requirements of that platform. Let me ask you. And that was from their own witness. Because you keep bringing us to the collateral, sort of the collateral estoppel of the underlying proceeding, where it was found that there was not a valid basis to terminate her. Can someone think they have a valid reason to terminate someone and be wrong without it being based on a discriminatory factor? Well, we get into the Reeves case in that matter. And Reeves was very specific then. Once you show that the termination is not legitimate, normally, under most cases, that becomes the question of motive, which is uniquely a jury question. So theoretically, a jury could come back and conclude, yeah, you know, the termination was wrong, but Grace was not, it doesn't have to be the only motivating factor, it has to be a motivating factor. But that, when it comes to motive, once I show that the termination was not legitimate, then it becomes, in my view, a jury question. I know you have quite a bit of rebuttal, so I'm just going to give you a heads up that when you're on rebuttal, I'm going to ask you to tell us which specific holdings in the state court in the Orange County decision you'd like us to give collateral estoppel effect to. Thank you. Thanks.  Good morning, Your Honors. Deanna Collins, Silverman & Associates, attorneys for Apelli, the Newburgh Enlarged City School District. May it please the Court. This case is a case about simply a speech-language teacher in Newburgh who has consistently failed to do her job. Her job is to teach speech-language services to her mandated students. The affirmative evidence that is not contradicted by any affirmative evidence on the plaintiff's part in this case establishes that Ms. O'Neill failed to account for over hundreds of speech-language therapy sessions throughout the 2020-2021 school year, both prior to the Google Attendance Spreadsheet requirement being imposed in February of 2021, as well as after. There are records, undisputed by plaintiff, that show Ms. O'Neill had not accessed the IEP direct system to input information therein for most, if not the majority, of her students throughout that period of time. I also want to bring the Court's attention to the Rule 56.1 statement in the record, which plaintiff has admitted that one of the essential job functions for all pull-out-related service providers, including speech-language therapists, is to input records and information about their sessions into IEP direct. Counsel's suggestion that Vice Principal, or Assistant Principal, Broncato's discussion with Ms. O'Neill after it had been found that she had been woefully derelict in inputting any of her speech-language therapy sessions for that school year into the IEP direct platform in February or March of 2021, does not account for the fact that she knew at that point in time, as well as before, that that was her job. The evidence shows dates and times of when Ms. O'Neill accessed her IEP direct system and entered in information for her approximately 45 or 47 students. The majority of that time was not accomplished until after Mr. Broncato and Principal Brooks and Ms. Orwick had a meeting, a disciplinary meeting, with Ms. O'Neill telling her, your records are not up to date, get them up to date. And you're saying this occurred before the second system of reporting was implemented? Yes, Your Honor. During COVID? Yes, Your Honor. There's no question that the staff at the school were overworked, which appears to be at least something that was at the forefront of the underlying proceedings relating to her termination. But are you saying that the lack of performance occurred even before this additional requirement and being a substitute teacher as well? Yes, Your Honor. The plaintiff's evidence that she had to cover classes, I would also point out, is alike to other employees within the same school building, which the records show, all races, all genders, all nationalities also had to cover classes. It had nothing to do with her race. In fact, I think the first person on the list of individuals who covered classes on a routine basis is a white teacher. Those requirements that whoever had time available, regardless of your race or your position, covered classes or watched the students in the hallways when other individuals were out sick from the pandemic or for whatever reason, had nothing to do with race. And the plaintiff has not shown that any of the examples that she uses for evidence of a prima facie case to infer discriminatory intent had anything to do with race. They're simply a part of her normal, everyday job responsibilities, along with everybody else in the building. That includes covering classes. That includes the idea that she was not allowed to come to work late for child care purposes. There's no evidence that any non-African American individual from the school was allowed to do any of these things or had any other responsibilities different than the appellants. Can I ask you about the hearing officer's decision? Yes. The plaintiff raises arguments about sort of preclusive effect of the later decision, the Orange County decision. But thinking about the hearing officer's decision, it ends with termination is required under the prior agreement.  I'm sort of trying to figure out what the school district can do at that point. I mean, termination is required, so she's terminated. How do we work that into our assessment of the propriety of the school district's termination and either the prima facie case or the pretext argument? It certainly, Your Honor, would point to lack of evidence of racial animus. The hearing officer, an independent party who looked at the evidence before her and found that the appellant had not been doing her job and according to the last chance provision of the settlement agreement was required to be fired, the district simply acted upon that decision. So is that sort of a per se answer to the this is not pretext? You don't really argue that, but I'm trying to understand how this matters because we're very focused on the next stage, which is the appeal of the hearing officer's decision. But the timeline is the school puts her on notice or the school district. There's this proceeding, and then after the proceeding is determined, she's terminated in response.  I believe it weighs very heavily in favor of defendants, which is to show that there is no evidence to show an inference of retaliatory animus to establish a prima facie case. Among other things, because the hearing officer, who is an independent party, found that the provisions of the last chance agreement were applicable in this case and therefore said termination is required. So how do you then respond to the question that I asked your opponent, which is because someone may think they have a valid reason to terminate someone and then be wrong, what does that do in terms of the collateral estoppel effect or implications to either the prima facie case, which you're answering now, or the pretext side? So in terms of prima facie case, there's a wealth of cases from the circuit and district courts below that indicate that simply being wrong in a decision does not mean that you are making the decision for improper or unlawful discriminatory reasons. So if the hearing officer's decision was somehow wrong, which we don't contend that it was, and the district, in relying upon that decision, relied upon that decision ultimately in theory, in error, which we don't argue that it was, that again does not show, does not help plaintiff's burden of establishing a prima facie case to show racial discriminatory intent. With respect to collateral estoppel, I'm not sure it would even matter. I mean, collateral estoppel in this case, plaintiff is arguing no legitimate reason could have been occurred or could have been found for the second step of the McDonnell-Douglas standard because of what the Article 7578 court's decision was. However, if the Article 7578 court's decision was simply saying that the hearing officer was wrong, once again, it has nothing to do with race. And there are several cases that we relied upon in our brief that indicate that it's widely accepted that a 7578 article petition does not collaterally estop a racial discrimination case, a federal racial discrimination case, unless, of course, the issue of race was argued or other identical issues that are relevant, which would allow for collateral estoppel. In this case, our position is that neither occurred in the Orange County decision, and therefore collateral estoppel simply does not apply. If there's any other questions, we will rest on our brief. Thank you, Your Honors. Thank you. Your Honor, I'd ask what decisions, number one, that it was impossible for her to complete the tasks that were given her. And what page is that? That's 1622. That's 1623.  That the circumstances were not substantially similar to the last chance agreement. That's 1623. And I just note that even the hearing officer himself acknowledged that there were extraordinary circumstances during the pandemic year. But you know what? We're going to use some uncharged, something that was uncharged to bolster determination. So there was also a violation of my client's due process rights. So the conclusion that the Orange County court draws is it would be unfair, given the extraordinary circumstances imposed by the pandemic, which nobody could have foreseen when they entered into this agreement, to terminate her, right? Correct. That's the upshot, is that it was unfair. It doesn't seem to me that the Orange County court is finding that there were not performance problems. The Orange County court seems to be saying, sure, there were. But come on. You can't fire somebody for having a hard time surviving COVID. But the court also mentioned that her workload doubled and that it was impossible for her to complete the tasks that, you know, that was impossible for her to do what they were asking. So as a result, it's not fair to hold it against her that she failed to meet these. Correct. I mean, they set unrealistic goals. The key here, there's a couple of keys to the case, but one key is Orwick, the special ed director, telling her, telling Brancato, this is their own witness, saying, listen, I don't care anything about Google attendance. The only thing that she has to do for attendance purposes, the only thing she has to do for attendance purposes is do the IEP direct. When my client was in these meetings, she asked Brancato, well, which is more important? And he goes, both are important. And she actually emphasized the Google direct. So the question is, you know, why would someone do that when the director of special ed in Newburgh is saying the only thing that really counts here is this one original platform that all the other special, all the other speech and language therapists were required to do. I mean, there's also a prior history, which we haven't gotten into at all, where she had by far the most cases of anybody. She had 92 cases when the regulations were 65. So that's also relevant background information. There's the principal herself who thought she was being discriminated against based on her race for the exact same reason. She was getting overloaded with work that other Caucasian principals weren't. Now, is that the key factor? No, but it's, again, a factor which a jury can draw upon where race, plausibly, they can reasonably conclude what was a factor here or a motivation. And it was Brancato who set this all in motion. So I would respectfully submit that the other one other thing I forgot to mention, she was traveling. And they try to distinguish, oh, she only had one or two students, but she was traveling. And all traveling special, all traveling providers, that's all they had to do. They didn't have to do anything other than the services. And she traveled three days a week to another school. So that's another evidence of disparate treatment. So she was traveling. She was also mentoring, to throw everything else in. So I respectfully submit that there's a lot of facts here that can reasonably, where a jury can reasonably conclude that race was a motivating factor in connection with my client's determination. And can I just refer you to them? Just to clarify, when you were on the question of a comparator, who are you, what's the appropriate comparator for her in terms of she's being treated this way based on her race? Is there a comparator that you're looking for? Yes. First of all, she was traveling to another school three days a week. And there were not other, who were you comparing her to? Other traveling special ed providers who didn't have, their only duty was to provide. There were white speech language therapists who did not, were not required to travel. Is that your? No, no. If they are traveling, that's all they have to do is, they don't have to do coverage. They don't have to do anything other than the services that they were provided. So if you're traveling, that's it. And they're similarly situated in that those traveling pathologists also had no more than two schools to which they traveled? Yeah. I mean, there's no different, I'm not aware of any differentiation of, well, you have to go to three schools or four schools now, period. They basically make the argument, well, she was only servicing. So all the traveling pathologists had two schools each? Right, right. And that's in the record somewhere? Yeah. Okay. All right. All right. Thank you. We have your argument. Okay. Thank you. We'll take this case under advisement as well.